IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LEE HUNT, as Personal
Representative of the ESTATE OF
JAMES CHAVEZ, deceased,

       Plaintiff,

v.                                     No.

THE UNITED STATES OF AMERICA,

       Defendant.

## COMPLAINT FOR MEDICAL NEGLIGENCE, VICARIOUS LIABILITY, WRONGFUL DEATH, AND LOSS OF CONSORTIUM ARISING UNDER THE FEDERAL TORT CLAIMS ACT AND NEW MEXICO LAW

COMES NOW Plaintiff, by and through his attorneys, MPJ Law Firm LLC, and for his Complaint against the Defendant states as follows:

### PARTIES AND JURISDICTION

1. This is a negligence and medical malpractice action brought pursuant to the Federal Tort Claims Act, USC §2671, *et. seq.* (hereinafter the "FTCA") and New Mexico law arising from negligence of federal employees and contract medical employees at the Rio Rancho Family Health Center ("RRFHC"), Rio Rancho, New Mexico, on or about June 20, 2017, resulting in the untimely and tragic suicide death of James Chavez, deceased.

2. Plaintiff claims that at all times material, the negligence complained of occurred at the RRFHC, operated by the Defendant United States of America through the Department of Health and Human Services.

3. Plaintiff Lee Hunt is the duly appointed personal representative of James Chavez through appointment as Personal Representative of James Chavez's wrongful death

estate, pursuant to the New Mexico Wrongful Death Act by Order of the Santa Fe County District Court, case number D-101-CV-2017-02809.

4.      Lee Hunt, personal representative, is a resident of Santa Fe County, New Mexico.

5.      James Chavez, deceased, lived in New Mexico at the time of his death.

6.      Defendant United States of America ("Defendant USA"), through its agents, employees, contract employees, and through the Department of Health & Human Services, all federal agencies, at all times hereinafter mentioned, did and now does operate the RRFHC, where claims of the Defendant United States' negligence arose. Defendant USA employed medical professionals and contract medical nursing personnel at RRFHC for psychiatric care and treatment of patients.  Defendant United States medical personnel, including Gary Allan, NP, and other nursing professionals, physician's assistants, and medical professionals were federal employees for purposes of imposing liability on Defendant arising under the Federal Tort Claims Act, 28 U.S.C. §2671, *et. seq.* (hereinafter the "FTCA").

7.      The claims for which Plaintiff sue arose from the acts and omissions of Defendant as alleged in this Complaint, and all such acts occurred within the State of New Mexico.

8.      If the Defendant USA was a private person it would be liable to Plaintiff in accordance with the laws of the State of New Mexico.

9.      Pursuant to 28 U.S.C. § 2679(d), any action against a federal employee acting within the scope of his office or employment at the time of the incident out of which the claim arose shall be deemed an action against the United States, and the United States shall be substituted as the party defendant.

10.      Pursuant to 28 US Code §§ 2401, Plaintiff properly presented this claim, in writing, to the appropriate Federal agency, by registered mail, within the mandated time limits.

11.     On May 24, 2018, the Department of Health & Human services denied Plaintiffs' Administrative Tort Claim.

12.     Plaintiff file suit herein within six (6) months from the date of mailing of the determination.

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(b)(1).

14.     Venue is proper in this Court.

## FACTS COMMON TO ALL COUNTS

15.     Plaintiff incorporates by reference as though fully set forth herein each and every allegation contained in the previous paragraphs of this Complaint, as though they were fully set forth herein and they become the allegations of the Complaint set forth.

16.     RRFHC is operated for treatment and evaluation of patients having psychiatric and emotional problems in varying degrees of seriousness pending the formulation of a planned approach for further care entitled a "Patient Plan."

17.     In that connection, RRFHC makes a preliminary diagnosis of a patient's propensity for suicide or self-inflicted injuries, among others, and is supposed to take precautions to prevent or reduce the risk of suicide of its patients who report suicidal ideations.

18.     On June 20, 2017, at approximately 8:30 AM, James Chavez presented to RRFHC for a "Psychological Evaluation."

19.     Gary Allan performed the purported Psychological Evaluation on June 20, 2017.

20.     The medical record "*generated by*: Gary Allan 06/22/2017 02:56 AM" and allegedly signed by Gary Allan at that time purports to document the Psychiatric Evaluation and

the interaction with James Chavez and his mother, which occurred two days prior, on June 20, 2017 at 8:30 AM.

21.     Gary Allan documented in the claimed June 20, 2017 medical record that James Chavez experienced the following symptoms every day:

        a.      Anxious/fearful thoughts;

        b.      Compulsive thoughts;

        c.      Depressed mood;

        d.      Difficulty concentrating;

        e.      Difficulty falling asleep;

        f.      Difficulty staying asleep;

        g.      Diminished interest or pleasure;

        h.      Excessive worry;

        i.      Fatigue;

        j.      Feelings of guilt;

        k.      Feelings of vulnerability;

        l.      Increased energy;

        m.      Racing thoughts;

        n.      Restlessness; and

        o.      Thoughts of death or suicide.

22.     Gary Allan documented in the claimed June 20, 2017 medical record that James Chavez experienced symptoms of:

        a.      Irritability;

        b.      Compulsive thoughts or behaviors

        c.      Feeling down;

        d.      Depressed or hopeless (nearly every day);

      e.      Invulnerability;

      f.      Suicidal ideation.

23.     Gary Allan documented in the Review of Symptoms section of the claimed June 20, 2017 medical record that James Chavez did not present with the following symptoms: decreased need for sleep, easily startled, impaired judgment and paranoia.

24.     Contrary to the Review of Symptoms section, Gary Allan documented in the History of Present Illness section of the claimed June 20, 2017 medical record that James Chavez had "periods of reduced need for sleep," that James Chavez stated "'I won't be tired and I am not tired at all'. I stayed up for 2 days three weeks ago, I didn't feel tired'." Further, Gary Allan documented that James Chavez reported insomnia alternating with hypersomnia.

25.     Contrary to the Review of Symptoms section, Gary Allan documented in the History of Present Illness section of the claimed June 20, 2017 medical record that James Chavez stated "'I have lately done things that I don't normally want to do'" indicating James Chavez did have symptoms of impaired judgment.

26.     Contrary to the Review of Symptoms section, Gary Allan documented in the History of Present Illness section of the claimed June 20, 2017 medical record that James Chavez was "hypervigilant when in public areas."

27.     Contrary to the Review of Symptoms section, Gary Allan documented in the History of Present Illness section of the claimed June 20, 2017 medical record that James Chavez had "an exaggerated reflex."

28.     Gary Allan documented that that James Chavez had a history of depression; was a victim of abuse or violence; avoided reminders of his father's murder as well as violence perpetrated by his father toward his mother; had family history of bipolar disorder, including his father who possessed "severe bipolar disorder" symptoms.

29.     James Chavez suffered from severe symptoms of bipolar disorder prior to June 20, 2017, as reflected in the medical records in possession and control of RRFHC on June 20, 2017.

30.     Gary Allan documented in the claimed June 20, 2017 medical record that James Chavez trialed paroxetine and fluoxetine with worsening symptoms or ineffectiveness so he stopped taking it.

31.     Contrary to the notation discussed in paragraph 31 above, Gary Allan documented in the purported "Medication Review (Psychiatric)" section that James Chavez was "compliant with mediation as prescribed"; "Medication response Moderate improvement"; and "Side effects Denied."

32.     On June 20, 2017, James Chavez reported daily use of cannabis for sleep to Gary Allan.  James Chavez inquired about a medical marijuana card.

33.     Gary Allan "explained that medical cannabis is not approved by the FDA and [Gary Allan] only prescribe [sic] medications that are FDA approved.  Discussed risks with using cannabis."

34.     The Global Assessment Functioning ("GAF") is a scoring system for the severity of illness in psychiatry.

35.     At all material times the GAF was used by RRFHC clinically and in the evaluation and treatment of James Chavez.

36.     At all material times, GAF was Axis V of the internationally accepted Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV).

37.     GAF is intended to be a generic rather than a diagnosis-specific scoring system.  It is constructed as an overall (global) measure of how patients are doing and rates psychological,

social, and occupational functioning, covering the range from positive mental health to severe psychopathy.

38.     Internationally, GAF recorded values can be either a single score (only the most severe of the symptom and function values is recorded) or separate scores for symptoms (GAF-S) and functioning (GAF-F).  For both there are 100 scoring possibilities (1-100).

39.     On April 10, 2017, James Chavez presented to RRFHC for anxiety.

40.     At the April 10, 2017 visit, RRFHC relied upon a GAF recorded value of 56 attributed to James Chavez from February 12, 2014.

41.     James Chavez was not seen or treated at RRFHC on February 12, 2014.

42.     Before February 12, 2014, James Chavez had not received evaluation or treatment at RRFHC since October 31, 2013.

43.     Medical records generated by RRFHC suggest a GAF assessment was performed on October 31, 2013, wherein the GAF recorded value attributed to James Chavez was a 55.

44.     Plaintiffs cannot confirm whether a GAF assessment was performed on October 3, 2013.

45.     A person with a GAF recorded value of 51-60 presents with moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

46.     The RRFHC medical records from October 31, 2013 indicate James Chavez was significantly more relaxed, confident and clear than he was in the therapy sessions provided on October 10, 2013 and October 10, 2013; and the initial evaluation of October 3, 2013.

47.     On October 3, 2013, James Chavez was attributed a GAF recorded value of 35.

48.     A person with a GAF recorded value of 31-40 presents with some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

49.     It would be impossible for RRFHC to perform a GAF assessment on February 12, 2014, since James Chavez was not present for treatment that day.

50.     No GAF assessment was performed on June 20, 2017.

51.     The PHQ-9 is a multipurpose instrument for screening, diagnosing, monitoring and measuring the severity of depression.

52.     At all material times the PHQ-9 was used by RRFHC clinically and in the evaluation and treatment of James Chavez.

53.     On April 10, 2017, James Chavez was attributed a PHQ-9 score or 6.

54.     On June 20, 2017, Gary Allan attributed a PHQ-9 score of 18 to James Chavez.

55.     In less than two months, James Chavez symptoms of depression escalated from that of potentially mild depression to moderately severe depression.

56.     Notwithstanding the allegations in Paragraph 56 above, proper application of the PHQ-9 by Gary Allan on June 20, 2017 would have yielded a PHQ-9 score of 27, thereby indicating major depression, severe.

57.     Outpatients reporting suicidal ideation "more than half the days" or "nearly every day" are at increased risk for suicide attempt or suicide death.  *See* Simon, G. E., Rutter, C. M., Peterson, D., Oliver, M., Whiteside, U., Operskalski, B., & Ludman, E. J. (2013). Does response

on the PHQ-9 Depression Questionnaire predict subsequent suicide attempt or suicide death? *Psychiatric Services, 64*(12), 1195-1202.

58.    Research also reveals that the risk of suicide attempts and suicides "emerged over several days and continued to grow for several months" which confirms "the need for sustained and organized follow-up care." *Id*.

59.    Among outpatients being treated for depression, a positive response to Question 9, which asks about "thoughts that you would be better off dead or of hurting yourself in some way" predicted both suicide attempts and suicides over the next year despite the differing patterns of risk for these behaviors. *Id*.

60.    James Chavez reported suicidal ideation to Gary Allan as frequent as nearly every day, but Gary Allan prescribed him Lamictal (Lamotrogine) and directed him to follow up in a month.

61.    With all of the information available to him on June 20, 2017, Gary Allan, knew or should have known, that James Chavez:

      a.    Had had talked about wanting to kill himself or to die.

      b.    Had a harsh attitude toward himself.

      c.    Had nightmares of the devil.

      d.    Was emotionally volatile.

      e.    Fixated on his father's murder.

      f.    Had anxious/fearful thoughts;

      g.    Had compulsive thoughts;

      h.    Had a depressed mood;

      i.    Had difficulty concentrating;

      j.    Had difficulty falling asleep;

k.     Had difficulty staying asleep;

l.     Had diminished interest or pleasure;

m.     Had excessive worry;

n.     Was fatigued;

o.     Had feelings of guilt;

p.     Had feelings of vulnerability;

q.     Had increased energy;

r.     Had racing thoughts;

s.     Was restless

t.     Had thoughts of death or suicide.

u.     Was irritable;

v.     Had compulsive thoughts or behaviors

w.     Felt down

x.     Felt depressed or hopeless (nearly every day);

y.     Felt invulnerable;

z.     Had suicidal ideations.

aa.     Reported insomnia alternating with hypersomnia

bb.     Was "hypervigilant when in public areas

cc.     Had "an exaggerated reflex."

dd.     Had a history of depression;

ee.     Was a victim of abuse or violence;

ff.     Had family history of bipolar disorder, including his father who possessed "severe bipolar disorder" symptoms.

gg.     Had suffered from severe symptoms of bipolar disorder prior to June 20, 2017.

hh.     Had poor impulse control

ii.      Had become increasingly impulsive.

jj.      Had a loss of interest in people or things.

kk.      Had feelings of worthlessness.

ll.      Had decreased appetite, increased fatigue, increased irritability.

mm.      had been previously suspended for fighting at school for using marijuana at school.

nn.      Had poor judgment.

oo.      Was easily distracted and had trouble concentrating.

pp.      Had difficulty making decisions.

qq.      Was angry and resentful.

rr.      Lost his temper easily.

ss.      Had witnessed domestic violence towards his mother by his father.

tt.      Abused marijuana.

uu.      Was developmentally delayed.

vv.      James Chavez's father was murdered in 2011; James fixated and blamed himself for his father's death since that time.

ww.      Was previously diagnosed with Post Traumatic Stress Disorder, Bereavement, bi-polar disorder, anxiety.

62.      A person is at risk for suicide as evidenced by one of the following:

a.      Pre-occupation with sad thoughts

b.      Verbalized feelings of hopelessness

c.      Crying and tearfulness

d.      Self-neglect

e.      Poor appetite, or compulsive eating

f.      Sleep difficulties or abnormal sleep pattern

g.      Pre-occupation with the disposition of possessions and arrangements of unfinished business

h.      Sudden calm in a previously agitated person, or unexplainable lifting of mood, euphoria, or excitement

i.      Lack or absence of support systems in a client's life

j.      Verbalization of suicidal feeling, threats, or plans

k.      Superficial self-mutilating actions, i.e., scratching self on the arms or hands.

63.     James Chavez medical records at RRFHC show all of these risk factors, save for pre-occupation with the disposition of possessions and superficial self-mutilating actions, were present for him.

64.     Many people with suicidal thoughts and impulses are ambivalent about killing themselves; those who are unambivalent are probably not seen by their doctors and do not visit a health care practitioner.

65.     Patients who are ambivalent usually give warning of their intent to someone and often visit their doctors prior to an attempt. This gives the physician an opportunity to evaluate the patient and often to save the patient's life through intervention.

66.     Patients who are severely depressed are at high risk of suicide. Depression is an affective reaction of low mood, characterized by feelings of sadness, discouragement, hopelessness, inadequacy and powerlessness. Symptoms of depression include sleeplessness, weight loss, poor appetite, lethargy and sadness. The most predictive factor for seriousness of suicidal intent is the degree of hopelessness about the future, more so than the degree of depression or any other aspect of the illness.  James Chavez reported to Gary Allan that he felt depressed and hopeless nearly every day.

67.     A socially isolated and lonely patient is more likely to complete the act than one with family or social supports.   Gary Allan was advised during the purported Psychiatric Evaluation that James Chavez was isolating himself more at home.

68.     The mood disorder most commonly associated with suicide is bipolar depression, type II (major depression). Unlike type I bipolar depression, in which the depression alternates with unmistakable manic episodes, the depression in type II bipolar disorder alternates with less obvious hypomanic episodes so that the bipolar nature of the disorder is frequently not recognized. As a result, patients with type II bipolar depression are often inadvertently denied a trial of lithium treatment, which has proven so effective in type I bipolar depression.  *See* Stevenson, J. M.: Suicide. In: Talbott, J. A., et al. (Eds.): The American Psychiatric Press Textbook of Psychiatry. Washington, D.C.: American Psychiatric Press, 1988.

69.     James Chavez symptoms and diagnosis on June 20, 2017 were consistent with that of Type II bipolar depression.

70.     Substance abuse is the second most frequent psychiatric disorder associated with suicide.  Patients who are alcoholic, who abuse drugs, who are agitated or who have a history of impulsive behavior are also at greatest risk of acting on impulse. These individuals are also the most unpredictable.  James Chavez admitted to Gary Allan that he smoked marijuana daily; Gary Allan Assessment Impression No 3. was that James Chavez abused cannabis.

71.     The following are key questions to ask the patient in a Psychological Evaluation: (1) Have you ever had thoughts of killing yourself?; (2) Have you ever attempted suicide?; (3) Are you currently having thoughts of suicide?; (4) Do you have a plan for committing suicide?; and (5) If so, what is your plan? Gary Allan's Psychological Evaluation of James Chavez stopped at question 1.

72.    The patient at greatest risk of committing suicide is the one who has devised a workable plan.  Whenever evidence of a plan is uncovered in the interview, the physician should assess the availability and lethality of the method, as well as the likelihood of discovery and rescue. Suicidal thoughts alone, however, should not be dismissed as necessarily indicating low risk, since some persons will give no other warning than this.

73.    The delivery of psychotropic medications to an adult with bipolar disorder and a history of suicide ideation is crucial in stabilization and prevention of depression and future suicidal behavior.

74.    Drug therapy is best managed by a psychiatrist during the acute phase.  Although some of these patients may be helped by anti-depressants, many, about 25 percent, often have problems with drinking. They use alcohol to alleviate their depression and anxiety, only to find that it exacerbates their despair and may actually precipitate an attempt as they lose inhibition. Thus it is important not to prescribe medications in these cases.  Despite James Chavez's admission of using marijuana on a daily basis, as reported to Gary Allan; Gary Allan prescribed him Lamictal (Lamotrogine).

75.    If the risk of suicide is high and it appears that it may be imminent, outpatient management is not appropriate, and the patient should be hospitalized for his own protection until the crisis passes and he can get psychiatric help.  James Chavez's anxieties and changing moods, as reported to Gary Allan, were a signal of his depressive and suicidal state.

76.    James Chavez's medical history was significant for serious depression, severe anxiety and suicidal ideation.  His depression was intensifying when he was seen on June 20, 2017.

77.     According to the New Mexico Department of Health, mental disorders increase the risk for both attempted suicide and suicide; approximately 90 percent of suicide victims have a diagnosable mental health condition, most commonly a mood or substance use disorder.

78.     It is well recognized that suicidal individuals may deny suicidal ideation or want to discuss their suicidal thoughts with care givers.  Nevertheless, James Chavez communicated clearly and repeatedly to Gary Allan that he had daily thoughts of killing himself.

79.     The self-reported substance abuse of marijuana on a daily basis suggested James Chavez possessed poor coping mechanisms associated with emotional distress.

80.     James Chavez's condition as reported to Gary Allan on June 20, 2017 clearly indicated James Chavez was at high risk of committed suicide. Notwithstanding, Gary Allan characterized James Chavez as a low risk for suicide.

81.     James Chavez's condition on June 20, 2017 was one of progressive deterioration, anxiety, depression, and desperation which contributed to his untimely death.

82.     Defendant USA, therefore, had extensive knowledge of James Chavez's mental health issues, medical conditions and history based upon its very own records, and its own interactions with James Chavez.

83.     Despite the existence of these factors, the Defendant USA failed to take the necessary precautions to prevent James Chavez's death.

84.     On June 20, 2017, Gary Allan did not request any drug-testing for James Chavez.

85.     On June 20, 2017, Gary Allan prescribed lamotrigine to James Chavez.

86.     The Manufacturer's Warning for Lamical (Lamotrogine) states that Lamical (Lamotrogine) increases the risk of suicidal thoughts or behavior in patients taking these drugs for any indication. Patients treated with any AED for any indication should be monitored for the

emergence or worsening of depression, suicidal thoughts or behavior, and/or any unusual changes in mood or behavior.

87.     Pooled analyses of 199 placebo-controlled clinical trials (monotherapy and adjunctive therapy) of 11 different AEDs showed that patients randomized to 1 of the AEDs had approximately twice the risk (adjusted Relative Risk 1.8, 95% CI: 1.2, 2.7) of suicidal thinking or behavior compared with patients randomized to placebo.

88.     Anyone considering prescribing Lamictal (Lamotrogine) or any other AED must balance the risk of suicidal thoughts or behavior with the risk of untreated illness.

89.     Safety and effectiveness of Lamictal (Lamotrogine) in the acute treatment of mood episodes have not been established.

90.     In addition, patients with a history of suicidal behavior or thoughts, those patients exhibiting a significant degree of suicidal ideation prior to commencement of treatment, and young adults are at an increased risk of suicidal thoughts or suicide attempts and should receive careful monitoring during treatment.

91.     Consideration should be given to changing the therapeutic regimen, including possibly discontinuing the medication, in patients who experience clinical worsening (including development of new symptoms) and/or the emergence of suicidal ideation/behavior, especially if these symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms.

92.     When Gary Allan was going to prescribe lamotrigine to James Chavez, his mother, Josie Roybal, asked Gary Allan of any side effects.  Gary Allan replied and said that his wife was on lamotrigine and that there were no side effects.

93.     On June 20, 2017, James Chavez took his first dose of lamotrigine.

94.     After James Chavez took his first dose of lamotrigine, he began acting very erratic.

16

95.     After James Chavez took his first dose of lamotrigine he stopped making contact with his family.

96.     James Chavez's mother called RRFHC on June 21, 2017 to advise James Chavez was set off on June 20, 2017; she was under the impression there were zero side effects of the Lamictal (Lamotrigine) and was trying to figure out what was going on.

97.     Gary Allan, on June 21, 2017, affirmed his lack of knowledge concerning the side effects and efficacy of Lamictal (Lamotrigine), and his failure to warn James Chavez and his mother of the potential side effects of Lamictal (Lamotrigine), including suicidal ideation and unusual changes in mood or behavior, when he reported back to James Chavez's mother that "lamotrigine has a calming effect and does not normally cause agitation or impulsivity."

98.     James Chavez hanged himself on or about June 20, 2017.

99.     The coroner ruled James Chavez's death a suicide.

## COUNT I – MEDICAL NEGLIGENCE AND NEGLIGENCE

100.     Plaintiff incorporates by reference as though fully set forth herein each and every allegation contained in the previous paragraphs of this Complaint, as though they were fully set forth herein.

101.     In caring for James Chavez, Defendant USA had a duty to adequately identify and evaluate the risk of suicide indictors and protective factors for James Chavez who presented with multiple suicidal behaviors and thought processes.

102.     In caring for James Chavez, Defendant USA had a duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-qualified healthcare providers practicing under similar circumstances, giving due consideration to the locality involved.

103.   In caring for James Chavez, Defendant USA had a duty to develop and implement a reasonable treatment plan based on a valid assessment of James Chavez's clinical needs.

104.   In caring for James Chavez, Defendant USA had a duty to appropriately modify James Chavez's reasonable treatment plan based on James Chavez's changing clinical condition.

105.   In caring for James Chavez, Defendant USA had a duty to document adequately to show that appropriate care was provided in terms of assessment, treatment, and ongoing monitoring of James Chavez.

106.   The standard of care requires that documentation must be timely, accurate, thorough, and informative as to mental health and functional problems, the inmate's care and the inmate's changes in condition. Consistent and accurate comprehensive assessments must be made.

107.   Defendant USA's conduct deviated from applicable standards in the following ways, but not by way of limitation:

    a.   Failure to provide James Chavez with the standard of medical care due to a patient;

    b.   Failing to possess or apply the knowledge, skill or care ordinarily used by reasonably well-qualified healthcare providers practicing under similar circumstances, giving due consideration to the locality involved by, without limitation: failing to know the risk factors, protective factors, current options/interventions including medications and the risks of medications prescribed, therapy, and hospitalization for patients like James Chavez who presented with a significant risk of suicide.

    c.   Failing to adequately identify and evaluate the risk of suicide indictors and protective factors for James Chavez who presented with multiple suicidal behaviors and thought processes by failing to obtain an adequate history; failing to contact prior medical professionals within RRFHC on prior assessment, evaluations, and diagnoses of James Chavez, including his previous diagnosis of bi-polar disorder from October 3, 2013, which had not yet been ruled out as initially contemplated in the October 3, 2013 treatment plan; failing to determine what treatments had previously failed and/or

provided benefit; failing to review prior medical records; failing to perform a full mental status exam; failing to perform a GAF; failing to properly evaluate and record James Chavez's risk of suicide; failing to reach a rational diagnosis based on careful examination, history of the patient, and the circumstances involved; failing to weigh psychodynamic factors; failing to diagnose suicidality;

d.      Failing to main hospital records showing the standard of care was implemented by, without limitation: failing to create contemporaneous record of actions and observations related to the risks associated with Lamictal (Lamotrogine), the increased risk of suicidal ideation and suicide while ingesting Lamictal (Lamotrogine), altering and/or modifying medical records after having received notice of an adverse reaction to the Lamictal (Lamotrogine) to conceal the fact that no risks or side effects of Lamictal (Lamotrogine) were communicated to James Chavez or his mother;

e.      Failing to timely and accurately document information that is informative to mental health and functional problems. Examples included the following: blanks appearing on dates and signature lines on numerous records generated by RRFHC;

f.      Failing to implement a reasonable treatment plan based on a valid assessment of James Chavez's clinical needs;

g.      Failing to implement an appropriate treatment plan modified based on an ongoing assessment of James Chavez' clinical status;

h.      Failing to take reasonable steps to ensure James Chavez's safety, including failing to take protective measures such as performing a more formal evaluation for potential self-harm done by adequately trained staff, or by referring to a local psychiatric service, or by placing or referring James Chavez's to an acute psychiatric hospital;

i.      Negligently providing psychopharmacologic management and by providing negligent medication prescribing by, without limitation, failing to obtain appropriate baseline laboratory testing before prescribing medication; failing to possess adequate and necessary knowledge of the risk associated with Lamictal (Lamotrogine); failing to inform

James Chavez of the risks associated with Lamictal (Lamotrogine);

j.      Failing to provide adequate post-discharge care;

k.      Failing to communicate with other providers involved in the patient's care who documented James Chavez's past suicidal risk and ideations;

l.      Failing to provide proper suicide prevention planning, suicide prevention monitoring, suicide prevention policies and procedures, and suicide prevention training so that James Chavez was allowed to commit suicide without proper monitoring, prevention and treatment;

m.      Negligently acting outside the scope of expertise and medical specialty without proper training or certification;

n.      Failure to apply standard accepted medical techniques with regard to caring and treating patients presenting with suicidal ideations;

o.      Negligently hiring, retaining, and supervising staff with the full knowledge those negligent staffing procedures would place patients such as James Chavez at risk for injuries; and

p.      Failing to train Gary Allan in the assessment and treatment of patients with suicidal behaviors;

q.      Failing to ensure that Gary Allan knew suicide risk factors, protective factors, knew the current options/interventions including medications, therapy, and hospitalization.

r.      Failure to properly acknowledge, treat and address James Chavez's medical condition.

s.      Failure to provide adequate training, supervision and or hiring for patients such as James Chavez, with the full knowledge that such inadequacies and practices would place patients such as James Chavez at risk for injuries;

t.      Failure to provide and implement proper care plans that would adequately meet James Chavez's needs, including his risk for suicide;

u.      Failing to provide services to attain or maintain the highest practicable physical, mental and psycho-social wellbeing of James Chavez.

108.    Defendant USA's acts were willful, wanton and in reckless disregard for the safety and well-being of James Chavez.

109.    As a proximate result of the acts or omissions of the Defendant USA's and their willful, wanton and reckless misconduct, James Chavez committed suicide.

## COUNT II – VICARIOUS LIABILITY

110.    Plaintiff incorporates by reference as though fully set forth herein each and every allegation contained in the previous paragraphs of this Complaint, as though they were fully set forth herein.

111.    Defendant USA, as owner/operator/manager of a New Mexico licensed healthcare facility and through its employees, agents, apparent agents, and contractors owed a duty of care to all foreseeable users of its facilities, including, James Chavez.

112.    Defendant USA, as the employer of all the federal medical personnel and medical contractor personnel at RRFHC, is vicariously liable for all the acts and failures to act which proximately caused Plaintiffs' damages.

113.    James Chavez suffered injuries while in the care of Gary Allan.

114.    James Chavez suffered injuries while in the care of John Does I-V.

115.    Gary Allan and Does I-V were acting within the course and scope of their employment in providing medical care and treatment for James Chavez.

116.    As such, Defendant USA is responsible for the acts and omissions of its employees, agents, apparent agents, or contractors.

117.    As a direct and proximate result of the aforesaid negligence on the part of Defendant USA, as the owner/operator/manager of a New Mexico licensed healthcare facility, and through its employees, agents, apparent agents or contractors acting in the scope of their

employment, agency, apparent agency or contract, James Chavez suffered injuries during his care and treatment at RRFHC.

118.    At all relevant times hereto, James Chavez acted reasonably for his person and without negligence.

## COUNT V – WRONGFUL DEATH

119.    Plaintiff incorporates by reference as though fully set forth herein each and every allegation contained in the previous paragraphs of this Complaint, as though they were fully set forth herein.

120.    Defendant USA through its employees, administrator, agents, servants, representatives, officers, directors, designees, physicians, nurses, nurse's aides, and/or contractors, who were acting within the scope of their employment, agency, apparent agency, or contract, were negligent in the care and services they provided to James Chavez.

121.    Defendant USA failed to use ordinary care in providing the appropriate treatment, care and safety that a reasonable and prudent facility, physician or nurse would have provided under the same or similar circumstances.

122.    Defendant USA breached its duty by failing to ensure James Chavez received adequate and proper care, treatment and supervision in an appropriate manner.

123.    As a direct and proximate result of Defendant USA's actions and/or inactions, James Chavez suffered physical and psychological pain and suffering, until his death.

124.    Plaintiff was damaged in amounts to be proven at trial as allowable by law.

## **DAMAGES**

125.    Plaintiff incorporates by reference as though fully set forth herein each and every

allegation contained in the previous paragraphs of this Complaint, as though they were fully set

forth herein.

126.    As a direct and proximate result of the negligent actions of Defendant USA

enumerated above, Plaintiff seeks the following damages:

a.    Loss of wages;

b.    Physical and emotional pain and suffering;

c.    Past medical expenses;

d.    Loss of enjoyment of life;

e.    Loss of consortium;

f.    Hedonic damages;

g.    All damages allowed under New Mexico's wrongful death statute;

h.    Pre-judgment and post-judgment interest, and their costs of suit, as allowed by law;

i.    Punitive damages; and

j.    For such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant USA for their damages and such other relief as permitted by law against the Defendant.

<div style="margin-left:50%">

MPJ Law Firm LLC

By: /s/ Michael P. Jasso

Michael P. Jasso
300 Menaul Blvd. NW, Suite A
PMB #245
Albuquerque, NM 87107
Tel: (505)263-2820
Fax: (866)458-0652
Michael@MPJLawFirm.com

</div>